01

02

03

04

05              UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF CALIFORNIA
06

07  ELMO CHATTMAN,                        )
                                          )
08          Petitioner,                   )   CASE NO. 2:07-cv-01298-RSL-JLW
                                          )
09          v.                            )
                                          )
10  THOMAS L. CAREY, Warden,              )   REPORT AND RECOMMENDATION
                                          )
11          Respondent.                   )
    _____)
12

        I.      SUMMARY
13

            Petitioner Elmo Chattman is currently incarcerated at the California State Prison,
14
    Solano in Vacaville, California.  He was convicted by a jury of first degree murder with a
15
    firearm enhancement in Ventura County Superior Court on May 30, 1979, and sentenced to 7-
16
    years-to-life with the possibility of parole.  (*See* Docket 7, Exhibit 1 at 1.)  He has filed a
17
    petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2004 denial of
18
    parole by the Board of Parole Hearings of the State of California (the "Board").[1]  (*See* Dkt. 1,
19
    Attachment D.)  Respondent has filed an answer to the petition, together with relevant
20
    portions of the state court record, and petitioner has filed a traverse in reply to the answer.
21
    (*See* Dkts. 7, 8, and 9.)  The briefing is now complete and this matter is ripe for review.  The
22

    _____
        [1] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1,
    2005.  *See* California Penal Code § 5075(a).

    REPORT AND RECOMMENDATION - 1

01  Court, having thoroughly reviewed the record and briefing of the parties, recommends the

02  Court deny the petition, and dismiss this action with prejudice.

03      II.   BACKGROUND

04      On July 31, 1978, petitioner Elmo Chattman's brother, Kenneth Chattman, got into an

05  argument with the victim, L.B. Jackson, at a local park.  (*See* Dkt. 7, Ex. 2 at 14.)  Kenneth,

06  who was high on PCP, then went to petitioner's house in search of a gun to use to confront the

07  victim, who he claimed had brandished a knife during the altercation.  (*See id*. at 16-17.)

08  Petitioner claims he successfully persuaded Kenneth not to take a gun from the house, and

09  decided to intervene in an attempt to calm the dispute.  (*See id*. at 14, 16-17, and 80-81.)  The

10  brothers then drove around in their car looking for the victim.  (*See id*. at 14-15.)  When they

11  failed to locate him, they drove to their father's bar, where they found the victim sitting in his

12  parked car in the rear parking lot.  (*See id*. at 15.)

13      At first, only petitioner exited the vehicle, and he walked to the victim's car window.

14  (*See id*.)  The two men began arguing, and petitioner became angry.  (*See id*.)  Petitioner told

15  the victim to get out of the car, and opened the victim's car door because he expected to fight.

16  (*See id*.)  Kenneth then exited the other vehicle carrying a rifle he had concealed either in the

17  trunk or backseat of his car wrapped in a blanket.  (*See id*. at 16.)  Kenneth jumped on top of

18  another vehicle parked next to the victim's car, and although the victim was still seated in the

19  driver's seat, Kenneth fired one round into the victim's right temple area.  (*See id*. at 14.)  The

20  two brothers then got back in their vehicle, and petitioner drove away at a high rate of speed.

21  (*See id*.)

22      Petitioner was convicted by a jury of first degree murder with a firearm enhancement

in Ventura County Superior Court on May 30, 1979, for serving as his brother's accomplice.

REPORT AND RECOMMENDATION - 2

01 (*See id.*, Ex. 1 at 1 and 16.)  At the time of the murder, petitioner was twenty-years-old.  (*See*

02 *id.* at 25.)  His minimum eligible parole date was set for December 28, 1985.  (*See id.* at 1.)

03 The parole denial which is the subject of this petition took place after a parole hearing held on

04 December 29, 2004.  (*See* Dkt. 1, Att. D at 1.)  This was petitioner's ninth parole

05 consideration hearing.  (*See id.*)  As of the date of the 2004 parole hearing, petitioner had been

06 in custody for approximately twenty-five years.

07        After denial of his 2004 application, petitioner filed habeas corpus petitions in the

08 Ventura County Superior Court, California Court of Appeal, and California Supreme Court.

09 (*See* Dkt. 7, Exs. 4, 6, 7, 9, and 10.)  Those petitions were unsuccessful.  (*See id.*, Exs. 5, 8,

10 and 11.)  This federal habeas petition followed.  Petitioner contends the 2004 denial by the

11 Board violated his Fifth and Fourteenth Amendment Due Process rights.  Thus, petitioner

12 does not challenge the validity of his conviction, but instead challenges the Board's 2004

13 decision finding him unsuitable for parole.

14        III.    STANDARD OF REVIEW

15        The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

16 petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

17 320, 326-27 (1997).  Because petitioner is in custody of the California Department of

18 Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

19 vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir.), *cert.*

20 *denied*, 543 U.S. 991 (2004) (providing that § 2254 is "the exclusive vehicle for a habeas

21 petition by a state prisoner in custody pursuant to a state court judgment, even when the

22 petitioner is not challenging his underlying state court conviction.").  Under AEDPA, a

habeas petition may not be granted with respect to any claim adjudicated on the merits in state

01 court unless petitioner demonstrates that the highest state court decision rejecting his petition

02 was either "contrary to, or involved an unreasonable application of, clearly established

03 Federal law, as determined by the Supreme Court of the United States," or "was based on an

04 unreasonable determination of the facts in light of the evidence presented in the State court

05 proceeding."  28 U.S.C. § 2254(d)(1) and (2).

06       As a threshold matter, this Court must ascertain whether relevant federal law was

07 "clearly established" at the time of the state court's decision.  To make this determination, the

08 Court may only consider the holdings, as opposed to dicta, of the United States Supreme

09 Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit

10 precedent remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

11 331 F.3d 1062, 1069 (9th Cir. 2003).

12       The Court must then determine whether the state court's decision was "contrary to, or

13 involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

14 *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

15 grant the writ if the state court arrives at a conclusion opposite to that reached by [the

16 Supreme] Court on a question of law or if the state court decides a case differently than [the]

17 Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

18 "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

19 state court identifies the correct governing legal principle from [the] Court's decisions but

20 unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

21 times, a federal habeas court must keep in mind that it "may not issue the writ simply because

22 [it] concludes in its independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly.  Rather that application must also be

01 [objectively] unreasonable." *Id.* at 411.

02    In each case, the petitioner has the burden of establishing that the state court decision

03 was contrary to, or involved an unreasonable application of, clearly established federal law.

04 *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

05 whether the petitioner has met this burden, a federal habeas court normally looks to the last

06 reasoned state court decision.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Medley*

07 *v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).  Where, as in this case, the state courts issue

08 summary denials without explaining their reasons, *see infra*, this Court must conduct an

09 independent review of the record to determine whether the state courts' decisions were

10 contrary to or involved an unreasonable application of Supreme Court holdings.  *See Delgado*

11 *v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).

12    Finally, AEDPA requires federal courts to give considerable deference to state court

13 decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

14 Federal courts are also bound by a state's interpretation of its own laws.  *See Murtishaw v.*

15 *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

16 (9th Cir. 1993)).

17    IV.    PRIOR STATE COURT PROCEEDINGS

18    Petitioner's three state court habeas petitions filed in the Ventura County Superior

19 Court, California Court of Appeal, and California Supreme Court contained identical claims,

20 and all three petitions were summarily denied.  (*See* Dkt. 1 at 1; *id.*, Atts. A, B, and C; Dkt. 7,

21 Exs. 5, 8, and 11.)  The parties agree that petitioner has properly exhausted his state court

22 remedies, and timely filed the instant petition.  (*See* Dkt. 1 at 1; Dkt. 7 at 3-4.)

    Typically, this Court looks to the state court's orders upholding the Board's decision

REPORT AND RECOMMENDATION - 5

01  to determine whether they meet the deferential AEDPA standard.  *See Ylst*, 501 U.S. at 803-

02  04.  As discussed *supra*, when a state court issues a decision on the merits but does not

03  provide a reasoned decision, we review the record independently to determine whether that

04  decision was objectively reasonable.  *See Delgado*, 223 F.3d at 982.  Although our review of

05  the record is conducted independently, we continue to show deference to the state court's

06  ultimate decision.  *See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

07          V.      FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

08          A.      *Due Process Right to be Released on Parole*

09          Under the Fifth and Fourteenth Amendments to the United States Constitution, the

10  government is prohibited from depriving an inmate of life, liberty or property without the due

11  process of law.  U.S. Const. amends. V, XIV.  A prisoner's due process claim must be

12  analyzed in two steps: the first asks whether the state has interfered with a constitutionally

13  protected liberty or property interest of the prisoner, and the second asks whether the

14  procedures accompanying that interference were constitutionally sufficient.  *Ky. Dep't of

15  Corrs. v. Thompson*, 490 U.S. 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d

16  1123, 1127 (9th Cir. 2006).

17          Accordingly, our first inquiry is whether petitioner has a constitutionally protected

18  liberty interest in parole.  The Supreme Court articulated the governing rule in this area in

19  *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482

20  U.S. 369 (1987).  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

21  "the 'clearly established' framework of *Greenholtz* and *Allen"* to California's parole scheme).

22  The Court in *Greenholtz* determined that although there is no constitutional right to be

    conditionally released on parole, if a state's statutory scheme employs mandatory language

REPORT AND RECOMMENDATION - 6

01  that creates a presumption that parole release will be granted if certain designated findings are

02  made, the statute gives rise to a constitutional liberty interest.  *See Greenholtz*, 442 U.S. at 7,

03  12; *Allen*, 482 U.S. at 377-78.

04      As discussed *infra*, California statutes and regulations afford a prisoner serving an

05  indeterminate life sentence an expectation of parole unless, in the judgment of the parole

06  authority, he "will pose an unreasonable risk of danger to society if released from prison."

07  Title 15 Cal. Code Regs., § 2402(a).  The Ninth Circuit has therefore held that "California's

08  parole scheme gives rise to a cognizable liberty interest in release on parole."  *McQuillion*,

09  306 F.3d at 902.  To similar effect,  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) held

10  that California Penal Code § 3041 vests all "prisoners whose sentences provide for the

11  possibility of parole with a constitutionally protected liberty interest in the receipt of a parole

12  release date, a liberty interest that is protected by the procedural safeguards of the Due

13  Process Clause."  This "liberty interest is created, not upon the grant of a parole date, but

14  upon the incarceration of the inmate."  *Biggs v. Terhune*, 334 F.3d 910, 915 (2003).  *See also*

15  *Sass*, 461 F.3d at 1127.

16      Because the Board's denial of parole interfered with petitioner's constitutionally-

17  protected liberty interest, this Court must proceed to the second step in the procedural due

18  process analysis and determine whether the procedures accompanying that interference were

19  constitutionally sufficient.  "[T]he Supreme Court [has] clearly established that a parole

20  board's decision deprives a prisoner of due process with respect to this interest if the board's

21  decision is not supported by 'some evidence in the record.'"  *Irons*, 505 F.3d at 851 (citing

22  *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard

    applies in prison disciplinary proceedings)).  The "some evidence" standard requires this

REPORT AND RECOMMENDATION - 7

01  Court to determine "whether there is any evidence in the record that could support the

02  conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56.  Although *Hill*

03  involved the accumulation of good time credits rather than release on parole, later cases have

04  held that the same constitutional principles apply in the parole context because both situations

05  directly affect the duration of the prison term.  *See e.g., Jancsek v. Or. Bd. of Parole*, 833 F.2d

06  1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme

07  Court in *Hill* in the parole context); *accord*, *Sass*, 461 F.3d at 1128-29); *Biggs*, 334 F.3d at

08  915; *McQuillion*, 306 F.3d at 904.

09      "The fundamental fairness guaranteed by the Due Process Clause does not require

10  courts to set aside decisions of prison administrators that have some basis in fact," however.

11  *Hill*, 472 U.S. at 456.  Similarly, the "some evidence" standard is not an invitation to examine

12  the entire record, independently assess witnesses' credibility, or re-weigh the evidence.  *Id.* at

13  455.  Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed.

14  *See id.* at 454.  The Court in *Hill* added an exclamation point to the limited scope of federal

15  habeas review when it upheld the finding of the prison administrators despite the Court's

16  characterization of the supporting evidence as "meager."  *See id.* at 457.

17          B.      *California's Statutory and Regulatory Scheme*

18          In order to determine whether "some evidence" supported the Board's decision with

19  respect to petitioner, this Court must consider the California statutes and regulations that

20  govern the Board's decision-making.  *See Biggs*, 334 F.3d at 915.  Under California law, the

21  Board is authorized to set release dates and grant parole for inmates with indeterminate

22  sentences.  *See* Cal. Penal Code § 3040 and 5075, *et seq.*  Section 3041(a) requires the Board

    to meet with each inmate one year before the expiration of his minimum sentence and

REPORT AND RECOMMENDATION - 8

01  normally set a release date in a manner that will provide uniform terms for offenses of similar

02  gravity and magnitude with respect to their threat to the public, as well as comply with

03  applicable sentencing rules.  Subsection (b) of this section requires that the Board set a release

04  date "unless it determines that the gravity of current convicted offense or offenses, or the

05  timing and gravity of current or past convicted offense or offenses, is such that consideration

06  of the public safety requires a more lengthy period of incarceration." *Id.*, § 3041(b).  Pursuant

07  to the mandate of § 3041(a), the Board must "establish criteria for the setting of parole release

08  dates" which take into account the number of victims of the offense as well as other factors in

09  mitigation or aggravation of the crime.  The Board has therefore promulgated regulations

10  setting forth the guidelines it must follow when determining parole suitability.  *See* 15 CCR

11  § 2402, *et seq.*

12       Accordingly, the Board is guided by the following regulations in making a

13  determination whether a prisoner is suitable for parole:

14       (a) General. The panel shall first determine whether the life prisoner is suitable
         for release on parole. Regardless of the length of time served, a life prisoner

15       shall be found unsuitable for and denied parole if in the judgment of the panel
         the prisoner will pose an unreasonable risk of danger to society if released

16       from prison.

17       (b) Information Considered. All relevant, reliable information available to the
         panel shall be considered in determining suitability for parole. Such

18       information shall include the circumstances of the prisoner's social history;
         past and present mental state; past criminal history, including involvement in

19       other criminal misconduct which is reliably documented; the base and other
         commitment offenses, including behavior before, during and after the crime;

20       past and present attitude toward the crime; any conditions of treatment or
         control, including the use of special conditions under which the prisoner may

21       safely be released to the community; and any other information which bears on
         the prisoner's suitability for release. Circumstances which taken alone

22       may not firmly establish unsuitability for parole may contribute to a pattern
         which results in a finding of unsuitability.

REPORT AND RECOMMENDATION - 9

01   15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability

02   factors to further assist the Board in analyzing whether an inmate should be granted parole,

03   although "the importance attached to any circumstance or combination of circumstances in a

04   particular case is left to the judgment of the panel." 15 CCR § 2402(c).

05        In examining its own statutory and regulatory framework, the California Supreme

06   Court in *In re Lawrence* recently held that the proper inquiry for a reviewing court is

07   "whether some evidence supports the *decision* of the Board … that the inmate constitutes a

08   current threat to public safety, and not merely whether some evidence confirms the existence

09   of certain factual findings."  *In re Lawrence*, 44 Cal.4th 1181, 1212 (2008).  The court also

10   asserted that the Board's decision must demonstrate "an individualized consideration of the

11   specified criteria, but "[i]t is not the existence or nonexistence of suitability or unsuitability

12   factors that forms the crux of the parole decision; the significant circumstance is how those

13   factors interrelate to support a conclusion of current dangerousness to the public."  *Id*. at

14   1204-05, 1212.  As long as the evidence underlying the Board's decision has "some indicia of

15   reliability," parole has not been arbitrarily denied.  *See Jancsek*, 833 F.2d at 1390.  As the

16   California courts have continually noted, the Board's discretion in parole release matters is

17   very broad.  *See Lawrence*, 44 Cal.4th at 1204.  Thus, the penal code, corresponding

18   regulations, and California law clearly establish that the fundamental consideration in parole

19   decisions is public safety and an assessment of a prisoner's current dangerousness.  *See id.*, at

20   1205-06.

21        C.    *Summary of Governing Principles*

22        By virtue of California law, petitioner has a constitutional liberty interest in release on

parole.  The parole authorities may decline to set a parole date only upon a finding that

REPORT AND RECOMMENDATION - 10

01    petitioner's release would present an unreasonable present risk of danger to society if he is

02    released from prison.  Where the parole authorities deny release, based upon an adverse

03    finding on that issue, the role of a federal habeas court is narrowly limited.  It must deny relief

04    if there is "some evidence" in the record to support the parole authority's finding of present

05    dangerousness.  The penal code, corresponding regulations, and California law clearly support

06    the foregoing interpretation.

07        VI.    PARTIES' CONTENTIONS

08        Petitioner contends that the Board violated his state and federal due process rights by

09    finding him unsuitable for parole without any evidence that he poses an unreasonable risk of

10    danger to society if released from prison.  (*See* Dkt. 1 at 19.)  Specifically, petitioner claims

11    that the Board's denial of parole based upon the immutable circumstances of the commitment

12    offense, as well as his disciplinary record in prison, were arbitrary and capricious.  (*See id*. at

13    19-38, and 47-55.)  In addition, petitioner contends that the Board failed to afford him an

14    individualized consideration of all relevant suitability factors, such as petitioner's remorse,

15    advancing age, participation in institutional activities which indicate an enhanced ability to

16    function within the law upon release, and the nonviolent nature of his criminal record.  (*See*

17    *id*. at 43-47, and 55-63.)  Finally, petitioner argues that the Board's retroactive application of

18    amendments to the California Penal Code and California Code of Regulations enacted after

19    petitioner's commission of the crime on July 31, 1978, violated his state and federal rights to

20    be free from *ex post facto* laws.[2]  (*See id*. at 66-87.)

21    _____

22        [2] We do not reach petitioner's claims that his state due process rights or right to be free from ex post
      facto laws under the California Constitution were violated, as state claims are not cognizable in a federal habeas
      petition.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (asserting that "it is not the province of a federal
      habeas court to reexamine state-court determinations on state-law questions.").

01      Respondent claims that petitioner does not have a constitutionally protected liberty

02 interest in being released on parole, that the "some evidence" standard is inapplicable in this

03 context, and that even if he does have a protected liberty interest, the Board adequately

04 predicated its denial of parole on "some evidence."  (*See* Dkt. 7 at 5-11.)  In addition,

05 respondent argues that petitioner's ex post facto claim regarding the 1979 amendment of the

06 California Code of Regulations lacks merit because the amended parole suitability factors

07 considered by the Board did not disadvantage petitioner.  (*See id*. at 11-13.)  Specifically,

08 respondent contends that the parole-suitability guidelines require consideration of the same

09 criteria in determining suitability for parole as they did prior to the enactment of the current

10 guidelines.  (*See id*.)  Accordingly, respondent asserts that petitioner's rights were not violated

11 by the Board's 2004 decision, and the Ventura County Superior Court's Order upholding the

12 Board's 2004 parole denial was not an unreasonable application of clearly established federal

13 law.  (*See id*. at 5-6, and 13.)

14      VII.    ANALYSIS OF RECORD IN THIS CASE

15      A.    *Commitment Offense*

16      The Board based its decision that petitioner was unsuitable for parole primarily upon

17 his commitment offense, as well as petitioner's escalating pattern of criminal conduct,

18 criminal record, failure to profit from society's prior attempts to correct his criminality,

19 history of unstable relationships with others, unfavorable disciplinary history in prison,

20 inconclusive 2004 mental health evaluation, and insufficient participation in self-help

21 programming.  (*See* Dkt. 7, Ex. 2 at 91-94.)  The Board's findings track the applicable

22 unsuitability and suitability factors listed in § 2402(b), (c) and (d) of title 15 of the California

Code of Regulations.  After considering all reliable evidence in the record, the Board

01 concluded that evidence of petitioner's positive behavior in prison did not outweigh evidence

02 of his unsuitability for parole.  (*See id*. at 96.)

03       With regard to the circumstances of the commitment offense, the Board concluded that

04 the offense was carried out in an especially heinous, atrocious, or cruel manner.  *See* 15 CCR

05 § 2402(c)(1).  The Board found that petitioner went looking for the victim with his brother,

06 "who had had a problem with the victim earlier." (*See* Dkt. 7, Ex. 2 at 91-92.)  When they

07 could not locate the victim, they drove to their father's bar, where they found the victim

08 sitting in his car in the rear parking lot.  (*See id*. at 92.)  After petitioner got out of the car to

09 talk to the victim, "things escalated … at which time Kenneth Chattman exited the car they

10 were in, armed with a gun, and shot the victim in the head." (*Id*.)

11       Based upon these facts, the Board found that the offense was carried out in a

12 calculated and cruel manner, because petitioner had sought out the victim in order to confront

13 him.  (*See id*. at 96.)  Even though petitioner's role in the commission of the murder did not

14 involve shooting the rifle, "[h]is presence there and the fact that he immediately left the scene

15 and did not take immediate responsibility for it was serious." (*Id*.)  *See also* 15 CCR §

16 2402(c)(1)(B).  The Board found that the victim was abused during the offense by being shot

17 in the head.  (*See* Dkt. 7, Ex. 2 at 96.)  *See also* 15 CCR § 2402(c)(1)(C).  Petitioner's failure

18 to summon medical help after the shooting also demonstrated "total disregard for human

19 suffering or even the consequences to follow," because petitioner was acquainted with the

20 victim and the victim's large family.  (*See* Dkt. 7, Ex. 2 at 96.)  *See also* 15 CCR §

21 2402(c)(1)(D).  In addition, the Board concluded that the motive for the crime was

22 inexplicable or very trivial in relation to the offense, because petitioner and his brother killed

the victim when he was not posing an imminent threat of harm.  (*See id*. at 96-97.)  *See also*

01  15 CCR § 2402(c)(1)(E).  Rather, petitioner and his brother "actually put themselves in

02  harm's way" by initiating the confrontation with the victim.  (*See* Dkt. 7, Ex. 2 at 96-97.)  The

03  circumstances surrounding the commitment offense and the trivial motive for the crime

04  provide "some evidence" to support the Board's finding that the murder was carried out in an

05  especially heinous, atrocious, or cruel manner.  *See* 15 CCR § 2402(c)(1).

06         The second, third, and fourth factors relied upon by the Board were petitioner's

07  escalating pattern of criminal conduct, prior criminal record, and failure to profit from

08  society's previous attempts to correct his criminality.  (*See* Dkt. 7, Ex. 2 at 92-93.)  *See also*

09  15 CCR § 2402(b) (requiring the Board to consider a prisoner's "past criminal history,

10  including involvement in other criminal misconduct which is reliably documented; the base

11  and other commitment offenses, including behavior before, during and after the crime....").

12  Specifically, the Board asserted that petitioner's escalating "history of criminality" included

13  arrests and convictions for burglaries and drug use, and culminated in the instant commitment

14  offense.  (*See* Dkt. 7, Ex. 2 at 92 and 97.)  Petitioner's drug use included downers,

15  barbiturates, LSD, marijuana, heroin and alcohol.  (*See id*. at 92 and 97.)  In addition,

16  petitioner "has had to pay restitution, has done time in county jail, CYA and was on CYA

17  parole at the time this crime was committed."  (*Id*. at 97.)  The Board also concluded that

18  petitioner has failed to profit from society's prior attempts to correct his criminality because

19  petitioner's prior grants of parole were revoked as a result of his drug use, and petitioner

20  committed the instant offense while he was released on parole.  (*See id*.)  Thus, there was

21  clearly "some evidence" to support the Board's findings with respect to petitioner's escalating

22  pattern of criminal conduct, prior criminal record, and failure to profit from society's previous

attempts to correct his criminality.

REPORT AND RECOMMENDATION - 14

01          The fifth factor relied upon by the Board was petitioner's unstable social history. (*See*

02   *id*. at 92.)  *See also* 15 CCR § 2402(c)(3).  The Board found that petitioner "had a history of

03   unstable relationships with others," especially with respect to his "relationship with the family

04   that he had at home." (*See* Dkt. 7, Ex. 2 at 92.)  The Board noted that petitioner was "raised in

05   a home where his parents separated.  He saw his mother being abused by his father.  He was

06   very strongly disciplined by his father [and] started the use of alcohol and marijuana at about

07   the age of 13…."  (*Id*.)  During the hearing, petitioner also told the panel that he lacked

08   guidance growing up because of his estrangement from his father.  (*See id*. at 26.)  Although

09   petitioner went to live with his father when his mother had a nervous breakdown, he

10   continued to blame his father for causing his mother's problems by abusing her.  (*See id*. at

11   26-27.)  Based upon the record, including petitioner's own testimony during the hearing, there

12   was "some evidence" to support the Board's finding that petitioner had a history of unstable

13   or tumultuous relationships with others.

14          The sixth factor relied upon by the Board was petitioner's disciplinary history in

15   prison.  A "CDC 115" form documents a prisoner's misconduct believed to be a violation of

16   law or otherwise not minor in nature.  *See* 15 CCR § 3312(a)(3); *In re Gray*, 151 Cal.App.4th

17   379, 389 (2007).  Petitioner has received twenty-three CDC 115's for prison-rule violations

18   since 1980, the most recent of which involved a serious prison-rule violation for possession of

19   inmate-manufactured alcohol in 2002, only two years before the 2004 hearing.  (*See* Dkt. 7,

20   Ex. 2 at 93.)  Petitioner's prison-rule violations have also involved fighting, sexual

21   misconduct, performance, currency and drug trafficking, refusing showers, sexual behavior in

22   the visiting room, excessive contact, possession of unissued material, being found under the

influence, leaving the job without permission, illegal copying, resisting staff, and additional

01   instances of possession of inmate-manufactured alcohol.  (*See id*. at 32-33.)

02        When questioned by the panel during the hearing about his most recent CDC 115 for

03   possession of squeezed fruit juice and pulp commonly used to make inmate-manufactured

04   alcohol, or "pruno," petitioner claimed that he was just "squeezing some apples … to just

05   drink it, you know.  But that is not to say that I haven't made – you know, on your birthday

06   you might drink a little pruno to get a little bit…." (*See id*. at 35.)  Petitioner then elaborated

07   regarding his use of drugs and alcohol in prison over time.  (*See id*. at 35-56.)  He asserted,

08   "For the first few years I was in prison, I didn't get high at all … for about five or six years.

09   And I had the same kind of pattern on the streets.  I can get high for so long and then I would

10   (indiscernable) burnout, you know." (*Id*. at 35-36.)   Eventually, however, "I started getting

11   bored, you know.  I might have got high.  I might, you know, do a little drinking…." (*Id*. at

12   36.)  Petitioner explained, "a beer buzz [is] no big deal to me.  I don't get drunk … I smoke

13   weed and I'm very self-conscious and I get paranoid.  So I find I don't like getting high the

14   way I did when I was a kid.  But every now and then in here, you know, I got high." (*Id*. at

15   36-37.)  Petitioner's extensive history of prison-rule violations, coupled with his comments to

16   the panel during the hearing, provide "some evidence" to support the Board's finding that

17   petitioner is unsuitable for release on parole.

18        The seventh factor relied upon by the Board was petitioner's inconclusive 2004

19   psychological evaluation.  Although the Board noted that the evaluation was supportive of

20   petitioner's release to some degree, the Board ultimately found the report "inconclusive"

21   regarding petitioner's "potential for violence in the community." (*Id*. at 93.)  Specifically, the

22   psychologist asserted that despite certain negative factors, such as petitioner's juvenile record

     and conduct in prison, as long as petitioner remains "abstinent of drugs and alcohol, the

01  potential [for violence] in the community is very low." (*Id*. at 93-94.)  Because the

02  psychologist indicated that petitioner's risk of dangerousness was largely dependent upon

03  petitioner's abstinence from drugs and alcohol, the Board found petitioner's recent CDC

04  115's related to drug and alcohol use in prison, including his serious 2002 violation, "even

05  more troublesome." (*See id*. at 93-94, and 97.)  Although the psychologist observed that

06  petitioner is capable of abstinence if he chooses such a course, the Board explained that "our

07  trouble with that goes along with some of the comments that were made [by petitioner] during

08  the hearing today." (*Id*. at 94.)  Therefore, in light of petitioner's disciplinary record in prison

09  and statements to the panel during the hearing, there was "some evidence" to support the

10  Board's findings that the 2004 psychological evaluation was "inconclusive," and a "longer

11  period of observation and evaluation" is necessary before petitioner is suitable for parole.

12  (*See id*. at 97.)

13          The eighth factor relied upon by the Board was petitioner's insufficient participation

14  in self-help programming.  The Board noted that petitioner has participated in "Making Anger

15  Work for You, Men's Advisory Council, Rational Behavior training, Men's Self-Help, the

16  DEUCE program and psychoanalysis at Tehachapi back in 1992." (*See id*. at 95-96.)  Despite

17  petitioner's participation in these programs, however, the Board concluded that petitioner has

18  "not sufficiently participated in beneficial self-help programs," and asked petitioner to

19  participate in additional self-help before the next parole hearing. (*Id*. at 93 and 97.)  As

20  mentioned above, in light of petitioner's statements to the panel concerning his history of drug

21  and alcohol use, as well as his recent prison-rule violations, there was "some evidence" to

22  support the Board's conclusion that petitioner should complete additional self-help

programming before he is found suitable for release on parole.

REPORT AND RECOMMENDATION - 17

01      Contrary to petitioner's argument that the Board failed to consider or give appropriate

02  weight to the parole suitability rules which favored petitioner, the Board acknowledged that

03  petitioner has recently developed a "very good social structure and relationships." (*See id.* at

04  92.) *See also* 15 CCR § 2402(d)(2) ("The prisoner has experienced reasonably stable

05  relationships with others.").  The Board also commended petitioner for receiving "above

06  average to exceptional work reports" for his work "as a hobby clerk, special order clerk,

07  vocational program clerk, law library clerk.  You've worked on the San Quentin News.

08  You've been a SHU clerk, [and worked in] culinary and the furniture factory." (Dkt. 7, Ex. 2

09  at 95-96.)  The Board noted that petitioner has obtained his A.A. and B.A. degrees, and

10  although he has not yet completed a certificate in any one vocation, he has participated in

11  several, including auto body, masonry, silkscreen, photograph training, cabinet and furniture

12  making.  (*See id.* at 95.)  Furthermore, the Board asserted that petitioner has "good" parole

13  plans, as long as he locates a substance abuse program in the area where he will be living.

14  (*See id.* at 94-95.)

15      It is therefore an inaccurate characterization of the record to say that the Board failed

16  to consider evidence that favored petitioner, or found him unsuitable for parole based solely

17  upon the commitment offense.  (*See* Dkt. 1 at 19 and 55.)  Contrary to the petitioner's

18  assertion that the Board failed to consider petitioner's nonviolent criminal record, remorse for

19  the crime, advancing age, or participation in institutional activities, the panel considered each

20  of these subjects during petitioner's hearing.  (*See* Dkt. 7, Ex. 2 at 29-30, 20-21, and 94-96.)

21  As mentioned above, the Board has broad discretion to determine how suitability and

22  unsuitability factors interrelate to support its conclusion of current dangerousness to the

public.  *See Lawrence*, 44 Cal.4th at 1212.  Despite petitioner's recent gains, the Board

01  determined that he remains an unreasonable risk of danger to society if released on parole,

02  and these findings were supported by "some evidence" in the record.  (*See* Dkt. 7, Ex. 2 at 91-

03  96.)

04      B.      *Petitioner's First* Ex Post Facto *Claim*

05      Petitioner contends that a 1979 amendment to section 2281(c) of title 15 of the

06  California Code of Regulations required the Board to consider circumstances it was not

07  obligated to consider under the governing regulations in 1978, the year of his commitment

08  offense, such as his unstable social history and details about the circumstances of the

09  commitment offense.  (*See* Dkt. 1 at 66-78.)  *See also* 15 CCR § 2281(c)(1)(A)-(E) and (c)(3).

10  Petitioner also asserts that the Board's retroactive application of the amended regulations

11  increased his punishment for his offense because the Board relied upon the circumstances of

12  his commitment offense and unstable social history in finding him unsuitable for parole

13  during his 2004 hearing.  (*See* Dkt. 1 at 77.)  As a result, he argues the 1979 amendment to

14  section 2281(c), as applied to him, constitutes an *ex post facto* law.  (*See* Dkt. 1 at 66.)  *See*

15  *also* U.S. Const., art. I, § 10.

16      The Ex Post Facto Clause of the United States Constitution prohibits the states from

17  passing any "ex post facto Law," a prohibition that "is aimed at laws 'that retroactively alter

18  the definition of crimes or increase the punishment for criminal acts.'"  *Cal. Dept. of*

19  *Corrections v. Morales*, 514 U.S. 499, 504 (1995).  *See also Weaver v. Graham*, 450 U.S. 24,

20  28 (1981) (providing that "[t]he *ex post facto* prohibition forbids the Congress and the States

21  to enact any law 'which imposes a punishment for an act which was not punishable at the time

22  it was committed; or imposes additional punishment to that then prescribed.'").  The United

States Supreme Court has held that "[r]etroactive changes in laws governing parole of

REPORT AND RECOMMENDATION - 19

01 prisoners, in some instances, may be violative of this precept." *Garner v. Jones*, 529 U.S.

02 244, 250 (2000). In order for a law to violate the Ex Post Facto Clause, "it must disadvantage

03 the offender affected by it." *Weaver*, 450 U.S. at 29.

04      The provisions of the California Code of Regulations governing parole were initially

05 promulgated in 1976. After the Determinate Sentencing Law ("DSL") came into effect on

06 July 1, 1977, DSL regulations called the Board of Prison Terms Rules were promulgated

07 approximately one year later. *See In re Duarte*, 143 Cal.App.3d 943, 946-948 (1983); *In re*

08 *Seabock*, 140 Cal.App.3d 29, 37-38 (1983). Section 2281(c) of title 15 of the California Code

09 of Regulations provides "general guidelines" for the Board's determination of a life-term

10 prisoner's parole suitability, and sets forth "Circumstances Tending to Show Unsuitability"

11 that the Board should consider during a parole hearing. *See* 15 CCR § 2281(c)(1)-(6). *See*

12 *also* 15 CCR § 2402(c)(1)-(6) (same). The text of section 2281(c) was altered by the

13 enactment of the new DSL regulations, and more specifically, by an amendment that became

14 effective in July 1979. *See* Cal. Admin. Register 79, No. 26, p. 230.2 – 231 (June 30, 1979);

15 *Duarte*, 143 Cal.App.3d at 948-49; *Seabock*, 140 Cal.App.3d at 38-39.

16      The California Court of Appeal has previously considered the Board's retroactive

17 application of amended section 2281(c) to prisoners whose crimes were committed prior to

18 the enactment of the 1979 amendment, and concluded the Board did not increase their

19 punishment. *See Duarte*, 143 Cal.App.3d at 950-51; *Seabock*, 140 Cal.App.3d at 40.

20 Specifically, after comparing the original regulations promulgated in 1976 with the

21 superseding DSL regulations, the California Court of Appeal concluded that the Board was

22 required to consider the same general criteria in determining suitability for parole under both

sets of regulations. *See Duarte*, 143 Cal.App.3d at 950; *Seabock*, 140 Cal.App.3d at 40.

REPORT AND RECOMMENDATION - 20

01 "Under both sets of rules the parole suitability decision involves a case-by-case analysis of all

02 relevant factors, the basic criteria being whether the prisoner's release creates 'an

03 unreasonable risk of danger to society.'" *See Duarte*, 143 Cal.App.3d at 950.  Furthermore,

04 although "the current regulations specify in much greater detail the criteria to be examined in

05 determining suitability, both sets of regulations contemplate a consideration of *all* relevant

06 information, and the factors mentioned are merely *examples*." *Id*. (*citing* 15 CCR § 2281(b)

07 and (c)).  Thus, despite the inclusion of more detail in section 2281(c) under the DSL

08 regulations, "the relevant criteria in determining suitability for parole have remained

09 substantially unchanged…." *See id*. at 951.  *See also Seabock*, 140 Cal.App.3d at 40

10 ("Retrospective application of DSL regulations … does not violate the ex post facto clause of

11 either the United States or the California Constitution.  What these newer … rules do is spell

12 out what was always the fact and the law….").  The United States Court of Appeals for the

13 Ninth Circuit has also expressed agreement with the California Court of Appeal in *Duarte* and

14 *Seabock*, and held that "application of the DSL parole-suitability guidelines to prisoners

15 sentenced under the [prior law] does not disadvantage them, and therefore does not violate the

16 federal constitutional prohibition against ex post facto laws." *Connor v. Estelle*, 981 F.2d

17 1032, 1033-34 (9th Cir. 1991).

18        In light of the conclusion of the California Court of Appeal and Ninth Circuit that

19 retroactive application of amended section 2281(c) does not constitute an *ex post facto* law,

20 petitioner's arguments to the contrary are unavailing.  Although section 2281(c), as amended

21 in 1979, required the Board to consider petitioner's commitment offense in detail, as well as

22 petitioner's unstable social history, both the 1978 and 1979 versions of the rule required the

Board to consider "all relevant, reliable information" and determine whether petitioner's

REPORT AND RECOMMENDATION - 21

01  release would present an unreasonable risk of danger to society.  *See* Cal. Admin. Register 78,

02  No. 31, p. 230 (August 5, 1978); Cal. Admin. Register 79, No. 26, p. 230.2 – 231 (June 30,

03  1979).  Thus, the Board's retroactive application of amended section 2281(c) during

04  petitioner's 2004 parole hearing did not violate petitioner's rights by increasing his

05  punishment in violation of the Ex Post Facto Clause.

06        C.     *Petitioner's Second* Ex Post Facto *Claim*

07        Petitioner's next claim concerns the Board's rescission of his parole date following a

08  grant of parole at his 1984 hearing.[3]  In addition to the Board's authority to grant parole and

09  set parole dates, it is authorized to postpone or rescind a parole date upon a showing of good

10  cause at a rescission hearing.  *See* Cal. Penal Code § 3040 (1978); 15 CCR § 2450 (1978).

11  *See also In re Fain*, 139 Cal.App.3d 295, 301 (1983) ("A typical parole rescission is based

12  upon prison misconduct or some other cause for rescission.").  Under the governing

13  regulations, "rescission proceedings" refer to "any proceeding which may result in the

14  postponement or rescission of a release date."  15 CCR § 2450 (1978).  Conduct by a prisoner

15  "which may result in rescission proceedings" includes certain disciplinary conduct identified

16  in the regulations, as well as "[o]ther conduct which seriously disrupts institutional routine,

17  which strongly indicates that the prisoner is not ready for release or is a danger to himself or

18  others, or which department staff believes should be reported to the board."  *See id.* at

19  § 2451(a).  During a rescission hearing for life prisoners, a "hearing panel [comprised of three

20  members] shall decide whether the prisoner engaged in the conduct charged and, if so, what

21  _____

22       [3] Because the U.S. Supreme Court has long held that a prisoner's *ex post facto* claim should be considered in light of the governing law at the time of the prisoner's commitment offense, petitioner's second *ex post facto* claim will also be considered in light of the California Penal Code and Code of Regulations in effect on July 31, 1978, the date of petitioner's commitment offense.  *See Lindsey v. Washington*, 301 U.S. 397, 401 (1937); *Morales*, 514 U.S. at 503.

REPORT AND RECOMMENDATION - 22

01  action should be taken." *See id.* at § 2467(b).  *See also In re Powell*, 45 Cal.3d 894, 902

02  (1988) (noting the Board's broad discretion to rescind a parole grant).

03      According to petitioner, the Board found him suitable for parole during his October

04  31, 1984, parole consideration hearing, and originally set a parole release date for May 27,

05  1990.  (*See* Dkt. 1 at 81.)  Following a series of prison-rule violations, however, the Board

06  held several rescission hearings.  (*See id.* at 81-82.)  At a rescission hearing held in January

07  1987, the Board postponed petitioner's release date for eighteen months in response to

08  disciplinary action taken by the prison for two CDC 115's petitioner received in 1986.  (*See*

09  *id.*)  During a subsequent rescission hearing held in April 1989, "the Board fully rescinded

10  petitioner's release date due to additional disciplinary action petitioner received in 1988."

11  (*See id.* at 82.)  Twelve months later, the Board held a parole consideration hearing during

12  which petitioner was found unsuitable for parole.  (*See id.*)

13      Petitioner contends that following the Board's rescission of his parole date in April

14  1989, the Board should have "re-set" his parole date rather than hold a parole consideration

15  hearing twelve months later.  (*See id.* at 79.)  In support of his argument, petitioner cites the

16  1978 version of the California Penal Code § 3041.5(b)(4), which provided that the Board shall

17  "set the prisoner's parole release date in accord with the provisions of Section 3041 and this

18  section" within six months of "any board action resulting in the rescinding of a previously set

19  parole date…."  *See* Cal. Penal Code § 3041.5 (1978).  Petitioner argues the Board should

20  have applied the 1978 version of this provision rather than the provision as amended in 1985,

21  which instead required the Board to "schedule the prisoner's next hearing within 12 months"

22  of "any board action resulting in the rescinding of a previously set parole date …."  Stats.

1985, ch. 1511, § 1, p. 5570-71.  Petitioner asserts that when the Board retroactively applied

REPORT AND RECOMMENDATION - 23

01  amended section 3041.5(b) and held a parole consideration hearing, rather than setting his

02  parole date, the Board effectively increased his punishment by returning him "to the status of

03  being unsuitable for parole," thereby creating a significant risk that petitioner would serve a

04  longer sentence.  (*See* Dkt. 1 at 78-80.)

05       In their briefing, petitioner and respondent both fail to reference the provisions of the

06  California Code of Regulations that relate to petitioner's claim.  (*See* Dkt. 1 at 78-87; Dkt. 7

07  at 11-13).  In fact, respondent fails to acknowledge petitioner's second *ex post facto* claim in

08  the answer.  (*See* Dkt. 7.)  Inspection of the applicable regulations, however, reveals that

09  petitioner's arguments lack merit.  California Penal Code § 3041.5(b)(4) cannot be interpreted

10  in isolation from its implementing regulations.  The administrative construction of governing

11  laws through the promulgation of regulations is entitled to great weight in determining what

12  the Legislature intended when it enacted the statutory scheme in controversy.  *DiPirro v.*

13  *Bondo Corp*., 153 Cal.App.4th 150, 192 (2007).

14       The governing regulations discussed below were in effect at the time of petitioner's

15  commitment offense.  These regulations set forth three possible outcomes that may result

16  from a parole rescission hearing.  If the charges against the prisoner are dismissed or the

17  prisoner is found not guilty by the panel, the prisoner shall normally be released on the

18  scheduled release date.  *See* 15 CCR § 2468 (1978).  Alternatively, if the Board takes action

19  "resulting in the postponement of a parole date," the prisoner is entitled to written notice of

20  "the new parole date and the reasons for the postponement," as well as the right to a review of

21  the postponement decision within 90 days.  *Id*. at § 2469.  Finally, the Board may instead

22  decide to take action "resulting in the rescission of a parole date."  *Id*. at § 2470.  If the Board

rescinds a parole date, the prisoner is entitled to a written statement "setting forth the reasons

REPORT AND RECOMMENDATION - 24

01  for the rescission" within ten days, as well as notification "that a parole consideration hearing

02  will be held six months after the rescission hearing." *See id*. A "parole consideration

03  hearing" refers to "[a]ny hearing at which a prisoner is considered for parole including an

04  initial parole hearing, progress hearing, subsequent hearing, and rehearing." *See id*. at

05  § 2000(b). When the Board is considering a prisoner for parole, "[t]he panel shall first

06  determine whether a prisoner is suitable for release on parole." *See* 15 CCR § 2281(a). Thus,

07  the regulations drew clear distinctions between the "postponement" and "rescission" of a

08  prisoner's parole date, the latter of which requires the prisoner's participation in a subsequent

09  parole consideration hearing before a new parole date will be set by the Board.

10       As a result, the governing regulations clearly authorized the Board to hold a

11  subsequent parole consideration hearing rather than set a new parole date for petitioner

12  following the Board's rescission of petitioner's parole date in April 1989. Petitioner has

13  therefore failed to demonstrate that the 1985 amendment to the California Penal Code

14  disadvantaged him by increasing his punishment, because the amendment followed the

15  procedure already set forth by the governing regulations. *See* Stats. 1985, ch. 1511, § 1, p.

16  5570-71; 15 CCR § 2470 (1978).

17       Furthermore, although the 1985 amendment to the California Penal Code required the

18  Board to schedule the prisoner's next parole consideration hearing within twelve months,

19  rather than six months as specified in the regulations, the U.S. Supreme Court has consistently

20  held that amendments to the law which increase the period of time between a prisoner's

21  parole consideration hearings constitutes a "procedural" rather than "substantive" change if it

22  is unlikely the prisoner would have been found suitable for parole during the interim. *See*

*Morales*, 514 U.S. at 506-13 (holding that an amendment to California law allowing the

REPORT AND RECOMMENDATION - 25

01  Board to hold subsequent parole consideration hearings for certain life prisoners every three

02  years instead of annually did not increase the prisoners' punishment); *Garner*, 529 U.S. at 256

03  (holding that the Georgia parole board's amended rule, changing the frequency of required

04  reconsideration hearings for life prisoners from every three years to eight years, did not

05  violate the Ex Post Facto Clause, and noting that "our analysis rests upon the premise that the

06  Board exercises its discretion in accordance with its assessment of each inmate's likelihood of

07  release between reconsideration dates.").  The U.S. Supreme Court has also noted that

08  "[a]ccording to the California Supreme Court, the possibility of immediate release after a

09  finding of suitability for parole is largely 'theoretical' … in many cases, the prisoner's parole

10  release date comes at least several years after a finding of suitability … it follows that 'the

11  practical effect' of a [parole consideration] hearing postponement is not significant."

12  *Morales*, 514 U.S. at 513.

13      Based upon these principles, the fact that the Board held petitioner's parole

14  consideration hearing within twelve months of the Board's 1989 rescission of his parole date,

15  rather than six months, did not disadvantage petitioner by increasing his punishment.  (*See*

16  Dkt. 1 at 82.)  Petitioner has therefore not satisfied his burden of demonstrating that the

17  Board's retroactive application of amended California Penal Code § 3041.5(b)(4) violated his

18  rights under the Ex Post Facto Clause.

19      VIII.   CONCLUSION

20      Given the totality of the Board's findings, there is "some evidence" in the record that

21  petitioner's release date as of the Board's December 29, 2004, decision would have posed an

22  unreasonable risk to public safety.  The Ventura County Superior Court's Order upholding the

Board's decision was therefore not contrary to, or an unreasonable application of, clearly

REPORT AND RECOMMENDATION - 26

01   established federal law, or based on an unreasonable determination of facts.  Because the

02   Board and the state courts' ultimate decisions were supported by "some evidence," there is no

03   need to reach respondent's argument that another standard applies.  Accordingly, I

04   recommend the Court find that petitioner's federal due process rights were not violated and

05   that the petition be denied, and this action be dismissed with prejudice.

06          This Report and Recommendation is submitted to the United States District Judge

07   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

08   after being served with this Report and Recommendation, any party may file written

09   objections with this Court and serve a copy on all parties.  Such a document should be

10   captioned "Objections to Magistrate Judge's Report and Recommendation."  Failure to file

11   objections within the specified time may waive the right to appeal the District Court's Order.

12   *See Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A proposed order accompanies this

13   Report and Recommendation.

14          DATED this 13th day of July, 2009.

15

16

17                                          JOHN L. WEINBERG
                                            United States Magistrate Judge
18

19

20

21

22